## DADE COUNTY v. STATE of FLORIDA, et al.

### No. 60 C 4447.

Circuit Court, Dade County.

June 27, 1960.

Darrey A. Davis, County Attorney, for the petitioner.

Richard E. Gerstein, State Attorney, and John C. Wynn, Ass't. State Attorney, for the state.

Milton M. Ferrell and J. M. Flowers, both of Miami, for the intervenors.

ROBERT H. ANDERSON, Circuit Judge.

*Opinion:* This statutory proceeding instituted by Dade County under and pursuant to the provisions of chapter 75, Florida Statutes, seeks validation of $46,000,000 general obligation bonds of Dade County for highway and bridge projects particularly described in county ordinance no. 60-12, as follows —

Constructing a section of North-South Expressway extending approximately from a point at or near S. W. 32nd Road and Viscaya Art Museum to a point at or near N. W. 2nd Street, including elevated structures, terminal ramps and interchanges;

Replacement of Flagler Street Bridge over the Miami River;

Acquisition of right of way between the Expressway and Biscayne Boulevard;

Reconstruction of N. W. 7th Street extending approximately from 42nd Avenue (Le Jeune Road) to 57th Avenue (Red Road);

Reconstruction of N. W. 12th Street extending approximately from Palmetto Road By-Pass (77th Avenue) to Airport Perimeter Road;

Extension of Tamiami Canal Road extending approximately from Flagler Street to N. W. 7th Street at Red Road (57th Avenue);

Reconstruction of N. W. 6th Avenue extending approximately from N. W. 20th Street to N. W. 29th Street;

Acquisition of right of way along Collins Avenue in Miami Beach extending approximately from 48th Street to 60th Street; and

Repairing existing county arterial streets.

Answers to the petition for validation and notice and order to show cause have been filed by the state attorney and by Messrs. B. E. Hearn, Russel A. Nafe and J. H. Keathley as intervening respondents. On June 9 and 14, 1960, testimony and evidentiary exhibits and arguments of counsel for the respective parties were received, heard and considered. Briefs have been submitted.

The issues in statutory bond validation proceedings of this character are limited to determination of the right and authority of the county to issue the bonds sought to be validated, and determination as to the regularity of the steps taken to issue the bonds involved. State v. City of Miami, Fla. 1958, 103 So.2d 185; State v. City of Tampa, Fla. 1957, 95 So.2d 409; and State v. City of Miami, Fla. 1949, 41 So.2d 888. In such statutory proceedings, the court may consider whether the county commission observed the proper procedure in the exercise of its powers to issue general obligation bonds, whether the particular bond issue is authorized by law, and whether the issuance of the bonds in-

volved conforms to the requirements of the Florida constitution. Ft. Myers v. State, 95 Fla. 704, 117 So. 97; State v. Citrus County, 116 Fla. 676, 157 So. 4; and State v. Belleair, 125 Fla. 669, 170 So. 434.

As for the right of the county to issue these bonds, it cannot be doubted that Dade County is vested with full power and authority to issue general obligation bonds for the purpose of constructing highways and bridges. Section 130.01, Florida Statutes, provides — "Whenever the board of county commissioners of any county shall deem it expedient, or to the best interests of such county, to issue the county bonds of their county, for the purpose of constructing paved, macadamized, or other hard-surfaced highways, . . . they shall determine by resolution to be entered in their records, what amount of bonds is required for such purpose, the rate of interest to be paid thereon, and the time when the principal and interest of such bonds shall be due and when payable."

Section 1.01 A (1) of the Home Rule Charter grants to the county commission the power to — "Provide . . . arterial, toll, and other roads, bridges, tunnels, and related facilities; eliminate grade crossings . . . and develop . . . master plans for the control of traffic and parking."

The condition precedent imposed by the Florida constitution for the issuance of general obligation bonds has been fully complied with in respect to the bonds here involved. Article IX, section 6, provides — " . . . the counties . . . of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such counties . . . shall participate, to be held in the manner to be prescribed by law . . . "

The record in this cause establishes that at the special bond election held on May 3, 1960, in conjunction with the first primary election, there were 133,049 qualified freeholder electors entitled to vote on the bond issue question submitted at such election. Of the 133,049 eligible freeholders, 105,112 (or 79 percent) participated in the bond election, by voting for or against the bond issue. And of the 105,112 freeholder electors participating in the election, 65,531 (or more than 62 percent) voted in favor of the bond issue; only 39,581 (or 38 percent) voted against the bond issue. Nearly 50 percent of all the eligible freeholders voted in favor of the bond issue. 25,950 more freeholders voted for the bond issue, than voted against it. Thus, the bond issue was carried by an overwhelming majority.

It is also apparent from the record, which includes, inter alia, documentary evidence totaling 35 exhibits, that all procedural requirements of law in respect to the issuance of the bonds were strictly complied with and adhered to in every particular.

The intervening respondents, however, have opposed the validation of these bonds upon two principal grounds —

1. That section 97.081, Florida Statutes, and section 100.241, Florida Statutes (portions of the "Election Code of 1951" involved herein) are unconstitutional.

2. That numerous persons, of a sufficient number to affect the election, voted illegally.

So for the first ground of objection raised by intervenors, the question of the constitutionality of section 97.081, Florida Statutes, has been heretofore determined and resolved by the Supreme Court of Florida. In State v. County of Sarasota, Fla. 1953, 62 So.2d 708, the Supreme Court said —

> The first question posed by appellant is whether the re-registration of the freeholders of Sarasota County, pursuant to Section 97.081, F.S.A., was a valid and lawful basis for determining that a majority of the qualified electors in Sarasota County who were freeholders residing in said County participated in said election as required by Section 6 of Article IX of the Florida Constitution.
>
> *   *   *
>
> We find nothing in the organic law of this State which prohibits periodic re-registration of voters as a presequisite to participation in elections, *so long as the machinery set up for such re-registration affords a reasonable opportunity to the citizens to register.* We think periodic registration greatly facilitates a correct determination of the number of freeholders entitled to participate in a bond election. (Emphasis supplied.)
>
> *   *   *
>
> We, therefore, hold that Section 97.081, F.S.A., is a constitutional enactment . . . and that the re-registration of the freeholders of Sarasota County was a lawful basis for determining that a majority of the freeholders of said County who were qualified electors of said County residing therein participated in said election.

There can be no question that the citizens of Dade County were afforded every reasonable opportunity to register and to vote in the bond election here involved. Petitioner's exhibit no. 33 consists of more than fifty typical newspaper articles that (a) urged all qualified freeholders to reregister, (b) informed citizens of their rights under section 100.241, Florida Statutes, to qualify and vote in the bond election, and (c) presented factual data concerning the bond issue and urged all freeholder electors

to participate in the election. It is therefore clear that the freeholders were not only afforded a "reasonable opportunity", but that they were urged almost daily for a period of nearly three months to exercise their franchise and vote their convictions in respect to this proposed bond issue.

Other questions identical with those raised by the intervenors in this suit were raised and decided adversely to their contentions in State v. Board of Public Instruction of Escambia County, Fla. 1959, 113 So.2d 368. In that bond validation suit, the Supreme Court considered, construed and sustained the validity and constitutionality of section 97.081 and section 100.241, Florida Statutes. The Court said —

This is an appeal from a final decree validating bonds proposed to be issued by Special Tax School District Number One of Escambia County.

\* \* \*

It is appellants' contention that a majority of the qualified electors who were also freeholders in Escambia County did not vote to approve the issuance of the bonds as required in Sec. 6, Art. IX, Fla. Const. This question of necessity will be answered in determining whether or not the reregistration of freeholders had pursuant to Sec. 97.081, F.S.A. was valid.

Appellants in effect contend that inasmuch as Escambia County had a permanent registration system . . . the provisions of Sec. 97.081 did not apply in that County and there could be no reregistration of freeholders.

\* \* \*

The conflict in the two acts is therefore that the former says that once an elector registers under the permanent system he will not thereafter be required to reregister, whereas the latter says that the freeholder electors may be required to reregister under the conditions outlined in the act.

\* \* \*

. . . Here there is positive conflict between portions of the two acts since the first act provides that no elector shall be required to reregister while the later act provides that freeholder electors may be required to register. Taking the later statute as a modification of the first gives effect to both statutes by giving each a field of operation and leaves neither meaningless. This meets the requirements of the rules of statutory construction.

\* \* \*

We therefore conclude that the reregistration of the freeholder electors was valid and that the number of freeholders entitled to vote on the issuance of the bonds in question was the number of such electors who reregistered as supplemented by those permitted to vote under the provisions of Sec. 100.241 (2) (d), supra.

The question of the constitutionality of Sec. 97.081 was decided adversely to appellants in State v. County of Sarasota, 62 So.2d 708, . . .

\*     \*     \*

. . . The effect of this decision, as implemented in part by Sec. 100.241 (2) (d), is merely to extend the time for completion of the list of freeholder electors to the date of the election and is not in conflict with the constitution . . .

The intervenors further contend that section 97.081, Florida Statutes, is not applicable to this election, because section 130.03, Florida Statutes, provides that an election shall be called and held in the manner prescribed in sections 100.201 - 100.351. This bond election was called and held in strict accordance with such statutory provisions. The contention made by intervenors overlooks the fact that section 97.081 (enacted after section 130.03 and constituting a modification thereof) specifically provides — "The county commissioners of any county . . . may at any time call for a reregistration of freeholder electors for the purpose of securing a new and up-to-date list of freeholders to be used for qualifying freeholder electors to participate *in any election called for the purpose of approving the issuance of bonds of such county.*" (Emphasis supplied.)

The additional contention made by the intervenors that the reregistration statute violates the provisions of section 2 of article VI of the Florida constitution has been determined adversely to the intervenors by the Supreme Court in Holmer v. State ex rel. Stewart, Fla. 1947, 28 So.2d 586.

The validity and constitutionality of these pertinent provisions of the "Election Code of 1951" has been sustained by the Supreme Court. Dade County strictly complied with the provisions and requirements of such controlling statutes.

The second main objection of the intervenors, that numerous persons, of a sufficient number to affect the election, voted illegally, cannot be sustained as a matter of fact or of law. The allegation in the answer of the intervenors that "numerous persons . . . voted illegally" is not supported by the evidence. On the contrary, all the election clerks and inspectors called as witnesses *on behalf of the intervenors* (and whose testimony is binding upon the intervenors) uniformly testified that the bond election and qualification of freeholder electors at the polls was regularly conducted in compliance with the provisions of section 100.241, Florida Statutes. At most, the intervenors' evidence most favorably construed could no nothing more than indicate that of the 105,112 freeholder electors participating in the bond election, not more than eight irregularities could be shown.

It is a well established and controlling principle of law supported by a long line of decisions of the Supreme Court that an election will not be set aside because some official has not complied with the law governing elections, unless it is conclusively established that fraud has been perpetrated or corruption or coercion was practiced *to a degree to affect the result.* 8 Fla. Law and Practice, Elections, section 191, and cases cited.

In State ex rel. Clark v. Klingensmith, 121 Fla. 297, 163 So. 704, the court said — "Illegal votes do not invalidate legal votes . . . Nor is the rejection of votes from legal voters, not brought about by fraud, and not of such magnitude as to demonstrate that a free expression of the popular will has been suppressed, sufficient to avoid an election, *at least unless it be shown that the votes rejected would have changed the result.*" (Emphasis supplied.)

In State ex rel. Pooser v. Wester, 126 Fla. 49, 170 So. 736, the court said — "In fine, nothing is relied on to vitiate the elections except that some illegal votes were cast. The rule is settled in this state that where an election is otherwise valid, it will not be held void because illegal votes were cast. *It must be shown that the illegal votes will change the result of the election.*" To the same effect, see State ex rel. Whitley v. Rinehart, 140 Fla. 645, 192 So. 819; Willets v. North Bay Village, Fla., 60 So. 2d 922; and Wilson v. Revels, Fla., 61 So. 2d 491.

In considering the challenge made upon the conduct of the bond election held on May 3, 1960, the court judicially knows that the voting precincts in Dade County were recently increased from 145 to 210, which necessitated a substantial increase in the number of election clerks and inspectors, of which many were new and inexperienced. The appropriate county officials made every conceivable effort to fully inform these election officials concerning their duties and the requirements of the Election Code. Class instruction was given for the education of every election official and printed instructions were delivered to all workers. These factors, coupled with the fact that 47,075 electors qualified as freeholders at the polling places during the election, resulted in a few, isolated irregularities, wholly insufficient to affect the result of the election in any way. A majority of 25,950 qualified freeholder electors voted in favor of the bond issue, as aforesaid. Irregularities or illegal votes sufficient to overcome this majority would have to be shown to invalidate the election under the authorities above cited. The burden rested upon the intervenors to establish that the results of the election were affected by the alleged irregularities at the polls. They wholly failed to carry this burden of proof.

Generally, deficiencies and irregularities in connection with the notice of holding an election are cured by a full and fair election of which electors had notice and in which a majority of those qualified actually participated. State v. City of Port St. Joe, Fla. 1950, 47 So. 2d 584. Here, all requirements of notice were strictly complied with, and a full and fair election held and conducted in accordance with the constitutional and statutory requirements. The established fact that strict compliance was had with the reregistration statute, and that the list of qualified freeholder electors was comprised of those who reregistered, as supplemented by those who qualified at the election under the provisions of section 100.241, Florida Statutes, impels the conclusion that the requirements of section 6 of article IX of the Florida constitution were fulfilled, and impels the validation of the bonds here involved. Under the constitution, the legislature — not the courts — prescribes the procedure to be followed in a reregistration to secure "a new and up-to-date list of freeholders" and in holding bond elections. The function of the courts is to interpret and enforce, and when it is established by competent testimony and evidence that the constitutional and statutory requirements have been complied with and strictly adhered to — as in this case — the courts should approve and validate the bonds involved.

Other contentions made by the respondents herein have been carefully considered and found to be without merit.

On the basis of the foregoing, and upon the record in this proceeding, it appears that the bonds herein sought to be validated, and the procedures employed as the predicate for issuing such bonds, are in all respects regular and in strict compliance with law. The court will enter an appropriate final decree validating the bonds in accordance with the views expressed in this opinion.

*Final decree:* This cause coming on to be heard on the 9th of June, 1960, at 2 P. M. and on the 14th day of June, 1960, at 10 A. M., at circuit court room no. 421 in the courthouse in the city of Miami, in the county of Dade, in the eleventh judicial circuit of Florida, upon the petition of Dade County, Florida, for the validation of $46,000,000 highway bonds of Dade County, Florida, dated as of August 1, 1960, pursuant to a notice and order to show cause heretofore issued on May 12, 1960 by this court requiring the respondents to show cause at said time and place why said highway bonds and the proceedings in connection with the issuance of said bonds should not be validated and confirmed as was prayed in said petition, and it appearing that copies of said notice and order and of said petition were served upon the state attorney for the eleventh judicial circuit of Florida, as required

by law, and that said notice and order was published as required by law, and that said state attorney has filed an answer as required by law, that B. E. Hearn, Russel A. Nafe, and J. H. Keathley have intervened and filed an answer in this cause and no one else has appeared or intervened herein; and it further appearing that the court has jurisdiction of this cause and of the subject matter hereof and of the parties hereto, and evidence having been introduced and the cause submitted for consideration and decision, the court, having heard and determined all of the questions of law and of fact in this cause, *finds the facts* as follows —

(a) All of the material allegations in said petition for validation are true, and the issuance of said $46,000,000 highway bonds of the county of Dade, Florida, dated as of August 1, 1960, has been duly authorized.

(b) On December 22, 1959 the board of county commissioners of Dade County, Florida, under the authority of section 97.081 of the Florida Statutes, duly passed and adopted resolution no. 4346 calling for a reregistration of freeholder electors of Dade County for the purpose of securing a new and up-to-date list of freeholders to be used for qualifying freeholder electors to participate in any bond election called for the purpose of approving the issuance of bonds of the county, including the special bond election to be held in the county at the time of the first primary election on May 3, 1960.

(c) On February 23, 1960 the board passed and adopted resolution no. 4655 directing the supervisor of registration of Dade County to publish a notice of such reregistration in the form fixed by said resolution.

(d) The registration books for said reregistration were kept open at the office of the supervisor of registration of Dade County at his office at 116 West Flagler Street, in the city of Miami, Florida, on each day except Sunday from 9 A. M. to 5 P. M. from February 1, 1960, through April 2, 1960. Said registration books were closed at the office of the supervisor of registration at 5 P. M. on April 2, 1960. Registration books for such reregistration were also kept open in the subregistration offices listed in the above-mentioned notice of reregistration on each day except Sunday from 9 A. M. to 5 P. M. from February 15, 1960 through March 12, 1960.

(e) Due and proper notice of said reregistration of freeholder electors was given by publication of said notice in the Miami Herald and the Miami News, newspapers published and of gen-

eral circulation in Dade County, on February 26, 1960, March 4, 1960, March 11, 1960, and March 18, 1960.

(f)    Pursuant to the authority conferred upon the county of Dade by chapter 130, Florida Statutes, and the charter of said county, the board at its meeting held on March 24, 1960, duly passed and adopted ordinance no. 60-12 authorizing the issuance, subject to the election therein provided for, of general obligation bonds of the county in the aggregate principal amount of $46,-000,000 for the purpose of constructing portions of a system of hard surfaced highways and bridges within the county and acquiring necessary rights of way therefor and acquiring additional rights of way for such system, and calling a special election to be held on Tuesday, May 3, 1960, for the purpose of submitting to the qualified electors of the county, who were freeholders therein the question whether such bonds should be issued.

(g)    At said meeting held on March 24, 1960, the board duly passed and adopted resolution no. 4814 providing for the holding of said special bond election and for the submission to the qualified electors of Dade County who were freeholders therein of the following question —

> Shall general obligation bonds of Dade County, Florida, in the aggregate principal amount of $46,000,000 be issued for the purpose of constructing portions of a system of hard surfaced highways and bridges within the County and acquiring necessary rights of way therefor and of acquiring additional rights of way for such system, such bonds to bear interest at a rate or rates not exceeding six per centum (6%) per annum, payable semi-annually, to be issued at one time or in series from time to time and to mature or the bonds of each series to mature at such time or times not exceeding thirty (30) years from their date or dates as may be determined by the Board of County Commissioners, and to be payable as to both principal and interest from unlimited ad valorem taxes on all taxable property within the County, which taxes may be eliminated or reduced in any fiscal year if and to the extent that funds from Federal aid allocations or other sources shall then be available and set aside for such purpose?

Said resolution no. 4814 fixed the form for the notice of said election, directed the publication of such notice, designated the polling places for the first primary election to be held on the same day as the places where said special bond election was to be held, and fixed the form of the ballot to be used at said election.

(h)    Due and proper notice of said election was given by publication in the Miami News, a newspaper of general circulation, on March 27, 1960, April 3, 1960, April 10, 1960, and April 17, 1960, and by publication of said notice in the Miami Herald, a

newspaper of general circulation, on March 28, 1960, April 4, 1960, April 11, 1960, and April 18, 1960, being at least once each week for four consecutive weeks before said election and the date of the first publication in each of said newspapers being at least thirty days before said election.

(i) Said special bond election was held at the same polling places in the several precincts, respectively, in the county, as the polling places for the first primary election held on the same day as said special bond election as provided in said resolution no. 4814 and in the notice of said special bond election, and the election officers who conducted said special bond election were the same as those selected and appointed for said first primary election.

(j) Said reregistration of freeholder electors was duly and properly held and notice thereof was duly given in accordance with law, notice of said election was duly published in the manner and for the time required by law and the election officers were duly appointed, qualified and acted as provided by law.

(k) Said election was duly and properly held in accordance with law and the resolutions providing therefor at the time and places appointed therefor and set forth in said election notice and each qualified elector of the county who was a freeholder therein was given the opportunity of voting for or against the issuance of the proposed bonds by voting a ballot containing the question set forth in paragraph (g) above.

(l) Said election and said reregistration of freeholder electors therefor were extensively and actively publicized in the county prior to the election and the freeholder electors in the county were repeatedly urged to register and vote in said election. No freeholder elector was denied the opportunity of voting in said election on said question; no one made any complaint to the board or to any officer of the board or to the state attorney of the eleventh judicial circuit of Florida of being denied the opportunity to vote in said election on said question, and none of said officers at any time heard any rumor of any freeholder being denied the opportunity to vote in said election on said question or of any complaint by anyone in the county with reference to being denied the opportunity to vote in said election on said question.

(m) The supervisor of registration of Dade County duly executed and filed with the board his certificate as to the number of freeholders who were duly qualified electors in Dade County and who were entitled to vote in said special bond election, and from the records in his office determined and declared that

the number of freeholders appearing on the registration books for said special bond election who were entitled to vote in said election was 85,974, that 47,075 additional freeholders voted in said special bond election under and by authority of subsection (d) of section 100.241, Florida Statutes, and that a total number of 133,049 persons qualified as freeholders to participate in said special bond election.

(n) At a meeting duly held on May 10, 1960, the board duly canvassed the returns of said special bond election and duly passed and adopted resolution no. 5067 canvassing said returns and declaring the results of said special bond election, and in said resolution found, determined and declared that there were 133,049 qualified electors residing in Dade County who were freeholders and entitled to vote in said special bond election held on May 3, 1960, on the question of issuing said bonds; that 105,-112 of said qualified freeholder electors, being more than a majority thereof, participated in said election and voted on the question of issuing said bonds; that 65,531 votes were cast in favor of the issuance of said bonds and 39,581 votes were cast against the issuance of said bonds; and that the issuance of said bonds was approved by a majority of the votes cast in said special bond election in which a majority of the freeholders who were qualified electors residing in Dade County participated.

(o) A majority of the qualified electors residing in Dade County who at the time of said special bond election were freeholders and legally entitled to participate therein did participate in said election on the question of issuing $46,000,000 bonds of the county, and a majority of the votes cast in said election on said question were in favor of approving and did approve the issuance of said bonds.

(p) At a meeting duly held on May 10, 1960 the board duly passed and adopted resolution no. 5068 providing for the issuance of said $46,000,000 bonds of the county under the authority of the constitution and laws of the state of Florida, including chapter 130, Florida Statutes, and the charter of said county for the purpose of constructing portions of a system of hard surfaced highways and bridges within the county and acquiring necessary rights of way therefor, and acquiring additional rights of way for such system.

(q) The construction of the portions of the system of hard surfaced highways and bridges and the acquisition of rights of way to be financed with the proceeds of said $46,000,000 highway bonds constitute a single project serving the interests of and being of benefit to the county and all of its inhabitants.

(r) The board of county commissioners of the county and the state road board of the state of Florida, acting on behalf of the state road department, entered into an agreement pursuant to which the county will deposit $40,000,000 of the proceeds of said highway bonds in a special trust fund for the use of the state road department for the construction as a part of the interstate system in the county of the sections of the north-south expressway referred to in ordinance no. 60-12, mentioned above in this decree, and the state road department will schedule for reimbursement to the county for application to the payment of said bonds in the years 1968 through 1971, if the present federal interstate program is continued and moneys are appropriated therefor, the total sum of $40,000,000, 90% of which is to be provided by the federal bureau of public roads and the remaining 10% is to be provided by the state road department.

As *Conclusions of Law* from the foregoing facts the court finds —

1. Chapter 130, Florida Statutes, and the charter of Dade County, Florida, fully authorize the county to issue said $46,000,000 highway bonds in the manner and form and for the purposes proposed and fully authorize the pledge of the full faith, credit and taxing power of the county and the levy and collection of unlimited ad valorem taxes upon all taxable property within the county for the payment of the principal of and the interest on said bonds as the same respectively fall due, which taxes may be eliminated or reduced in any fiscal year if and to the extent that funds from federal aid allocations or other sources shall then be available and set aside for such purposes, and the petition for validation filed in this proceeding is sufficient to authorize the validation of said bonds as prayed for in said petition.

2. Section 97.081 of the Florida Statutes fully authorizes a reregistration of freeholder electors in the county as called for and held pursuant to resolutions nos. 4346 and 4655 of the board, mentioned above in this decree, for the purpose of securing a new and up-to-date list of freeholders to participate in any bond election in the county including the special bond election held in the county on May 3, 1960, to approve the issuance of said bonds.

3. Ordinance no. 60-12 and the resolutions mentioned above in this decree were properly adopted by the board and were and are sufficient in form and in substance to authorize and provide for the issuance of said bonds, to authorize and provide for the holding of said special bond election on May 3, 1960, on the question of the issuance of said bonds and to authorize and provide for the due registration of freeholder electors for said election.

4. Said reregistration of freeholder electors was duly and properly held and notice thereof was duly given in accordance with law and said resolutions nos. 4346 and 4655 calling for such reregistration, notice of said election was duly published in the manner and for the time required by law, and the inspectors and clerks of election were duly appointed, qualified and acted as provided by law.

5. Said special bond election was duly called and held, proper notice thereof was given, due registration therefor was had, the returns of said election were duly made and canvassed, a majority of the qualified electors residing in the county of Dade who at the time of said election were freeholders and legally entitled to participate in said election did participate therein on the question of the issuance of said highway bonds and a majority of the votes cast in said election were in favor of approving said bonds, as required by and in all respects in accordance with the provisions of section 6 of article IX of the Florida constitution.

6. The purpose for which said bonds are authorized to be issued is a single purpose, being for a single project comprised of related portions, the question of issuing said bonds was lawfully submitted at said special bond election as a single question and resolution no. 4814, mentioned above in this decree, providing for the submission of said question at said special bond election complied in all respects with the provisions of section 6 of article IX of the Florida constitution.

7. The construction of the part of the interstate highway system in Dade County to be financed with $40,000,000 of the proceeds of said highway bonds is of benefit to the county and its inhabitants and constitutes a proper county purpose, and the application of such $40,000,000 proceeds to such construction will not violate the provisions of section 5 of article IX of the Florida constitution.

8. The agreement between the county and the state road department of the state of Florida referred to in paragraph (r) of this decree was entered into pursuant to full authority of law and is a valid and binding agreement between the parties thereto.

9. Said $46,000,000 highway bonds have been duly authorized and approved in the manner and as required by law, and when issued will be general obligations of the county for the prompt payment of which and the interest thereon as the same shall fall due the full faith, credit and taxing power of the county are irrevocably pledged.

10. All the taxable property within the county is subject to the levy of unlimited ad valorem taxes for the payment of said highway bonds and the interest thereon, which taxes shall be levied annually and collected at the same time and in the same manner as ad valorem taxes levied for operating expenses of the county and are to be in addition to all other taxes authorized to be levied by the county, and which taxes may be eliminated or reduced in any fiscal year if and to the extent that funds from federal aid allocations or other sources shall then be available and set aside for such purpose.

11. This court has jurisdiction to hear this cause and to render a decision herein and is fully authorized by law to validate said bonds and the proceedings therefor.

It is, therefore, ordered, adjudged and decreed that said $46,000,000 highway bonds dated as of August 1, 1960 (hereinafter more particularly described), and the proceedings therefor, be and the same are hereby validated and confirmed.

Said $46,000,000 highway bonds are to be issued in the denomination of $1,000 each, numbered consecutively from 1 upwards, are to bear interest from their date until their payment at a rate or rates not exceeding six per centum (6%) per annum, such interest to the respective maturities of the bonds being payable semi-annually on the 1st days of February and August in each year, and are to be stated to mature in numerical order, lowest numbers first, on August 1 in the following years and in the following amounts —

| Year of Maturity | Principal Amount | Year of Maturity | Principal Amount |
|---|---|---|---|
| 1961 | $ 410,000 | 1976 | $1,690,000 |
| 1962 | 425,000 | 1977 | 1,760,000 |
| 1963 | 440,000 | 1978 | 1,830,000 |
| 1964 | 460,000 | 1979 | 1,900,000 |
| 1965 | 480,000 | 1980 | 1,980,000 |
| 1966 | 500,000 | 1981 | 2,055,000 |
| 1967 | 520,000 | 1982 | 2,140,000 |
| 1968 | 190,000 | 1983 | 2,225,000 |
| 1969 | 600,000 | 1984 | 2,315,000 |
| 1970 | 975,000 | 1985 | 2,405,000 |
| 1971 | 1,000,000 | 1986 | 2,505,000 |
| 1972 | 1,445,000 | 1987 | 2,605,000 |
| 1973 | 1,505,000 | 1988 | 2,705,000 |
| 1974 | 1,565,000 | 1989 | 2,815,000 |
| 1975 | 1,625,000 | 1990 | 2,930,000 |

The bonds at the time outstanding which mature after August 1, 1971, may be redeemed prior to their respective maturities, at the option of the county either in whole, or in part in the inverse order of their maturities, on any date not earlier than August 1, 1967, from any moneys that may be made available for such purposes, at the principal amount of the bonds to be redeemed, together with the interest accrued thereon to the date fixed for redemption, plus a premium of 3½% of such principal amount if redeemed prior to August 1, 1970, 3% of such principal amount if redeemed on August 1, 1970, or thereafter prior to August 1, 1972, 2½% of such principal amount if redeemed on August 1, 1972, or thereafter prior to August 1, 1974, 2% of such principal amount if redeemed on August 1, 1974, or thereafter prior to August 1, 1976, 1½% of such principal amount if redeemed on August 1, 1976, or thereafter prior to August 1, 1978, 1% of such principal amount if redeemed on August 1, 1978, or thereafter prior to August 1, 1980, ½ of 1% of such principal amount if redeemed on August 1, 1980, or thereafter prior to August 1, 1982, and without premium if redeemed on August 1, 1982, or thereafter.

The bonds will be registrable as to principal alone and to transfer in accordance with the provisions for such registration and transfer endorsed thereon.

Both the principal of and the interest on the bonds will be payable at the principal office of the Chase Manhattan Bank in the Borough of Manhattan, City and State of New York or, at the option of the holder or registered owner, at the First National Bank of Miami in the City of Miami, Florida, in any coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

The bonds will be signed by the chairman and by the clerk of the board of county commissioners of the county and will be sealed with the official seal of said board, and the interest coupons thereto attached will be executed with the facsimile signature of said clerk. In case any officer whose signature or a facsimile of whose signature shall appear on any bonds or coupons shall cease to be such officer before the delivery of such bonds such signature or such facsimile shall nevertheless be valid and sufficient for all purposes the same as if he had remained in office until such delivery. The bonds and the interest coupons thereto attached and the statement of validation to be endorsed on said bonds will be, respectively, substantially in the forms set forth in said resolution no. 5068.